UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KENNETH ALVAREZ, CAROL SHELTER and RAUL FLORES, Individual Providers in Washington,<br><br>Plaintiffs,<br><br>v.<br><br>GOVERNOR JAY INSLEE, in his official capacity as Governor of the State of Washington, PATRICIA LASHWAY, in her official capacity as Secretary of the Washington Department of Social and Health Services, SERVICE EMPLOYERS INTERNATIONAL UNION HEALTHCARE 775 NW, a labor organization,<br><br>Defendants. | CASE NO. 16-5111 RJB<br><br>ORDER ON MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on the Defendant Service Employers International

Union Healthcare 775 NW's ("Union" or "SEIU 775") Motion for Summary Judgment (Dkt.

91), the State Defendants' Motion for Summary Judgment (Dkt. 95), Plaintiffs' Motion for

Summary Judgment (Dkt. 100 refiled as corrected 104-1 and as unredacted at 107-7), and

1   Plaintiffs' Motion to Seal and/or Redact Documents (Dkt. 106).  The Court has reviewed the

2   pleadings filed regarding the motions, and the remaining record, and is fully advised.  Oral

3   argument is unnecessary to decide the motions.

4        Originally filed on February 11, 2016, Plaintiffs are "individual provider[s] . . . of

5   personal or respite care services" ("IP") who are paid by the State to provide care for qualifying

6   disabled individuals.  Dkts. 1 and 85.  They assert that they have been constructively forced to

7   listen to Union presentations as a condition of employment in violation of their First Amendment

8   rights.  *Id.*  Plaintiffs seek declaratory and injunctive relief, and attorneys' fees and costs.  *Id.*

9        Defendants now move to have the case summarily dismissed.  Dkts. 91 and 95.  Plaintiffs

10  seek to have summary judgment granted in their favor.  Dkts. 100, refiled as corrected 104-1,

11  refiled as corrected and unredacted as 107-7.  For the reasons provided, the Defendants' motions

12  (Dkts. 91 and 95) should be granted, Plaintiffs' motion for summary judgment (Dkts. 100, 104-1

13  and 107-7) should be denied, and the case dismissed.

## I.      FACTS

15  A. **IPs, STATE AND FEDERAL REQUIREMENTS, AND THE COLLECTIVE
       BARGAINING AGREEMENT BETWEEN THE STATE AND UNION**

16

    The State offers services to certain Medicaid-eligible seniors and adults with disabilities to

17

18  prevent them from having to enter institutional care, like nursing homes.  Dkt. 97, at 2.  Some of

    these services include in-home personal care from IPs.  *Id.*  In order to get paid by the State, IPs

19

20  must meet federal and State requirements.  Dkt. 105-2.  In Washington that includes:  signing a

    contract with the State about the terms and conditions of their employment (usually at an initial

21

22  contracting appointment, but a contracting appointment is not required), 5 hours of orientation

    and safety training, 70 hours of basic training, and 12 hours of continuing education each year.

23

    Dkts. 105-2, at 17-40 and 114 and 111, at 2.  The continuing education can be done online or in

24

1   person.  Dkt. 105-5, at 35.  Many IPs do continuing education online.  *Id.* and Dkt. 107-2, at 12.

2   An independent 26 U.S.C. § 501 (c)(3) organization and multi-employer welfare benefit plan

3   (which was created by Washington law, RCW 74.39A.360), SEIU Healthcare Northwest

4   Training Partnership ("Training Partnership"), schedules and provides the training.  Dkt. 93, at 1.

5      As required by state law, all IPs are part of a single statewide bargaining unit.  RCW

6   74.39A.270; Dkt. 98, at 2.  SEIU 775 was elected by the bargaining unit to be the "exclusive

7   bargaining representative" for Washington's IPs.  Dkt. 98, at 2.  All the IPs are bound by the

8   terms of the Collective Bargaining Agreement ("CBA") negotiated and agreed to by the State

9   and the Union every two years.  Dkts. 98, at 2 and 105-2 at 49.

10      It is difficult for the Union to reach and communicate with the IPs because IPs do not work

11   or gather in a central location, but rather work in private homes throughout Washington.  Dkt.

12   98, at 3.  According to the State, in order "to facilitate voluntary communication between SEIU

13   775 and the bargaining unit members . . . about union membership, rights, and benefits" (Dkt.

14   98, at 2), the State agreed in the 2015-17 CBA to allow a Union representative 15 minutes of

15   time to meet with potential IPs at the initial contracting appointment (Dkt. 105-2, at 20).  The

16   State and Union also agreed to a provision in the 2015-17 CBA "requiring the State to

17   compensate IPs for up to 30 minutes of their time at basic training spent in union presentations,"

18   and for up to 15 minutes a year at continuing education training.  Dkt. 98, at 2.

19      Accordingly, the relevant portion of the original 2015-2017 CBA, Section 2.3, provided, in

20   part: "[t]he State will also provide fifteen (15) minutes for a Union representative to meet with

21   the individual provider(s) participating in the contracting appointments."  Dkt. 98, at 12.  A

22   portion of the original Section 2.3 further provided that:

23         If the state office has regularly scheduled recurring time for [IPs] to view the
           initial safety and orientation training, the State will make the Union aware of

24

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT- 3

1    these reoccurring meetings on an annual basis.  The State will also provide fifteen
     (15) minutes for a Union representative to meet with the individual providers.

2

3    Dkt. 98, at 12.  The original Section 15.13 A of the 2015-2017 CBA also provided, in part: the

4    State "agrees to compensate up to thirty (30) minutes of time for a presentation on Union issues

5    to all [IPs] receiving the Union portion of required basic training . . . [and] up to fifteen (15)

6    minutes of time annually for a presentation on Union issues to all [IPs] receiving the Union

7    portion of required continuing education."  *Id.*, at 13-14.  (If IPs choose to take their continuing

8    education classes online, they have the option to watch a Union presentation video.  Dkt. 93, at

9    3.)  The State has been able to allow for Union presentations, whether in person or online, at no

10   additional cost to the State.  Dkt. 105-2, at 156.

11        Further, in accord with the CBA, Union designated materials are included in a large

12   packet of orientation documents given to IPs at their contracting appointment.  Dkt. 105-2, at 83-

13   84. The relevant portion of the 2015-2017 CBA concerning this is Section 2.6, which states that:

14        Orientation materials distributed by the Employer . . . to [IPs] shall include Union
          membership applications and Union orientation materials.  Union materials
          distributed by the Employer shall be neutral in tone. It shall be the Union's
15        responsibility to provide the Employer with sufficient copies of such materials for
          distribution during orientation and training.

16
     Dkt. 98, at 12.  The intent is to provide the IPs with a current copy of the CBA and any changes

17   to the CBA.  Dkt. 111, at 3.

18   **B.  PLAINTIFF KENNETH ALVAREZ**

19        Plaintiff Alvarez began working as an IP in March of 2015, providing care to his fiancée.

20   Dkt. 105-3, at 13.  In November of 2014, he learned that he could get paid to be an IP.  *Id.*, at 16.

21   Plaintiff Alvarez contacted the State, and was told that he needed to come in to sign a contract,

22   pick up paperwork and get fingerprinted.  *Id.*  He was also told that he needed to watch some

23   training DVDs, and after he completed all of that, he could go to the training courses.  *Id.*, at 17.

24

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT- 4

1        According to Plaintiff Alvarez, at his first contracting appointment, on February 24, 2015,

2   Sherri Olson (a contractor for the State) handed him a stack of papers and told him he had to sign

3   them to get paid.  Dkt. 105-3, at 19.  Included in the packet was a Union membership

4   application.   Dkt. 105-3, at 20.  Plaintiff Alvarez states that he asked if he had to sign the Union

5   membership application, and he asserts that Ms. Olson told him he had to or he would not get

6   paid.  Dkts. 100-2, at 3 and 105-3, at 20.

7        Plaintiff Alvarez states that he returned on March 4, 2015, filled out the Union membership

8   application, signed it, and gave it to Ms. Olson.  Dkt. 105-3, at 23.  Plaintiff Alvarez also signed

9   his contract with the State on March 4, 3015.  *Id.*, at 25.

10       On March 25, 2015, Plaintiff Alvarez returned a call from the Union.  Dkt. 105-3, at 27.  The

11  call was recorded.  *Id.*, at 28.  The Union's representative stated that it was "a recorded call for

12  assisting in completing a membership application." *Id.* She stated that language from the

13  membership application would be read to Plaintiff Alvarez, and his verbal agreement was

14  needed.  *Id.*  Referred to as a "voice authorization card," Plaintiff Alvarez orally agreed that he

15  "request[ed] and accept[ed] membership in [SEIU 775]" and to other terms and conditions of

16  membership in the Union.  *Id.*, at 28-29.

17       Plaintiff Alvarez did not meet with a Union representative at his contracting appointments,

18  and attended only one Union presentation, at his basic training on April 11, 2015, because he

19  thought it was bundled in with the other training.  Dkt. 105-3, at 46-47.  (The website where

20  Plaintiff Alvarez registered for classes allowed him to de-select the Union Presentation (Dkt. 93,

21  at 3), but he did not understand that he could do that (Dkt. 105-3, at 46-47)).  Although he was

22  given a Union membership card at the April 11, 2015 Union presentation, his membership card

23  is dated May 11, 2015.  Dkt. 105-3, at 48-49.

24

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT- 5

1    Plaintiff Alvarez acknowledges that none of the paperwork he was given indicated that

2   attendance at Union presentations was mandatory.  Dkt. 105-3, at 55-60.  He has never been told

3   that his contract with the State would be terminated if he did not attend a Union presentation.

4   *Id.*, at 60.  Plaintiff Alvarez has now opted out of the Union and is still working and being paid

5   as an IP.  *Id.*  Plaintiff Alvarez testified that he does not believe that he will be forced to attend

6   Union presentations in the future as a condition of employment with the State as an IP.  *Id.*, at

7   65-66.  He filed this case on February 11, 2016.  Dkt. 1.

8   **C.  STATE AND UNION ENTER A MEMORANDUM OF UNDERSTANDING ON
       APRIL 4, 2016**

9

10   In order to make it clear that the Union presentations are not mandatory, the State and the

    Union agreed to a Memorandum of Understanding on April 4, 2016.  Dkt. 94, at 4 and 98, at 16-
11
    17.  This Memorandum of Understanding replaces Article 2.3 and 15.13 A of the 2015-17 CBA
12
    with the following:
13
       **2.3 Access to New Individual Providers during the Contracting Process and
14       Safety and Orientation Trainings**.

15           A.  The Union will be provided the opportunity to meet with new [IPs] for
                 fifteen (15) minutes during the contracting process.  The Employer and
16               its agents will take steps to consolidate the contracting appointments
                 into one (1) or two (2) designated days of the week, and will inform
17               the Union of the designated days or other contracting arrangements.

18           B.  If the state office has regularly scheduled recurring times for [IPs] to
                 view the initial safety and orientation training the State will make the
19               Union aware of these reoccurring meetings on an annual basis.  The
                 State will also provide fifteen (15) minutes for a Union representative
20               to meet with [IPs].  The Union will attend either the safety and
                 orientation training or the initial contracting appointment.
21
             C.  [IPs] will not be required to meet with Union representatives and will
22               suffer no discrimination or retaliation as a result of their choice to meet
                 or not to meet.  The Employer will remain neutral, and will not either
23               encourage individual providers to meet or discourage them from
                 meeting with Union representatives. . .
24

1

2

**15.13 Access to Training**

3

A.  Union Presentation Compensation

4

The parties agree that the Training Partnership shall provide the Union with reasonable access to its training classes, including providing the Union with technical support for online learning, in order for the Union to make a presentation concerning the Union and [IPs'] rights and benefits ("Union issues"). The content of the presentation will be determined solely by the Union, but will not include urging support or opposition to any political candidate or ballot measure, and will be in compliance with RCW 42.52.160 and .180.  The Employer agrees to compensate up to thirty (30) minutes of time for a presentation on Union issues to all [IPs] attending the Union portion of required basic training.  The Employer agrees to compensate up to fifteen (15) minutes of time annually for a presentation on Union issues to all [IPs] attending the Union portion of required continuing education.  [IPs] are not required to attend the Union presentations, and will suffer no retaliation or discrimination as a result of their choice to attend or not to attend. . .

5

6

7

8

9

10

11  Dkt. 98, at 16-17.  The State then informed its field offices about the April 4, 2016,

12  Memorandum of Understanding and the changes it made.  Dkt. 105-2, at 47.

13      The State is not aware of an IP who has had their contract terminated or faced any negative

14  repercussions from the State for declining to attend, or objecting to, a Union presentation.  Dkts.

15  97, at 3; 98, at 4

16  **D.  PLAINTIFF CAROL SHETLER**

17      After the April 4, 2016 Memorandum of Understanding amended the CBA, on October 25,

18  2016, Plaintiff Carol Shetler joined this lawsuit.  Dkt. 51.  She has been an IP since "early 2000,"

19  and provides care for her son.  Dkt. 105-5, at 8-9.  She signed a Union membership card on

20  March 31, 2006.  *Id.*, at 13.  She testified that when she receives Union material in the mail, she

21  "[p]artially" reads it sometimes and throws it away.  *Id.*, at 15.  She acknowledges that she has

22  never read the CBA, but knows that she could get a copy from the Union if she asked.  *Id.*, at 21-

23

24

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT- 7

1   22. Several months after learning that she did not have to be a Union member, Plaintiff Shetler

2   canceled her Union membership in May of 2016. *Id.*, at 13 and 21.

3        On June 28, 2016, Plaintiff Shelter attended a class as part of her required continuing

4   education. Dkt. 105-5, at 40. At the start of the class, the instructor said that a Union

5   representative was coming to make a presentation. *Id.* After the Union representative came in

6   and passed out Union membership cards for people to sign, Plaintiff Shelter states that she spoke

7   up and told the group that Union membership was not required. Dkts. 105-5, at 41 and 100-4, at

8   4. Plaintiff Shelter informed the group that she had opted out; the Union representative said that

9   "she was sorry to hear that." Dkt. 105-5, at 41-42. Plaintiff Shelter went on to say that the

10  Union had not been helpful. *Id.*, at 42. Plaintiff Shelter was not told she did not have to listen to

11  the Union presentation and she did not ask. *Id.*, at 44. She states that she did not leave the June

12  28, 2016 class because she "did not want to feel like a black sheep." *Id.*

13       On September 22, 2016, Plaintiff Shetler went into a State office to renew her contract. Dkt.

14  105-5, at 25. (According to Plaintiff Shetler, IPs must renew their contract every four years. *Id.*)

15  Plaintiff Shetler states that she and a group of maybe six others went to a conference room and

16  sat down. *Id.* She alleges that she was given several documents to fill out and sign, including

17  one that stated that "as a provider [she was] required to belong to the Union." *Id.*, at 26.

18  Plaintiff Shetler states that she spoke up about this; said that it was not true, IPs do not have to

19  belong to the Union, and that the form needed to be updated. *Id.*, at 28. She alleges that the

20  State employee essentially responded that she was "just reading the form." *Id.* Plaintiff Shetler

21  states that others at the meeting said, "I have no problem with the Union," in response to her

22  raising the issue. *Id.*, at 29. Plaintiff Shelter states that she now understands that she is not

23  required to attend any Union presentations. *Id.*, at 52.

24

1    **E.  PLAINTIFF RAUL FLORES**

2    Plaintiff Raul Flores, who also joined this lawsuit on October 25, 2016, is an IP for his

3    nephew.  Dkt. 105-4, at 10.  He has been an IP since July of 2016.  Dkts. 51 and 105-4, at 10.

4    His mother set up the contracting appointment for him to occur on July 5, 2016.  Dkt. 105-4, at

5    14.  He received a document that stated, "[p]lease complete and return the following forms:

6    Contractor intake form, background authorization, fingerprint-based background check notice

7    and W-9."  *Id.*, at 16.  That document also stated that at the contract appointment, he would "sign

8    [his] contract, receive training information, union materials and an Employee Reference Guide."

9    *Id.*, at 17.

10    On July 5, 2016, Plaintiff Flores signed his contract, and states that he understood that all the

11    terms and conditions of his employment with the State were in the contract.  Dkt. 105-4, at 20.

12    Plaintiff Flores acknowledges that no one told him that he had to be a member of the Union to be

13    an IP.  *Id.*, at 21.

14    At his contracting appointment, after being greeted by a State employee and a lady named

15    Peggy, who introduced herself as a Union representative, the State employee excused herself and

16    Peggy talked with Plaintiff Flores about the Union for around 15 minutes.  Dkt. 105-4, at 24.

17    During this conversation, Plaintiff Flores was given the impression that Union membership was

18    free.  *Id.*  Plaintiff Flores states that he didn't understand the difference between the State

19    employee and the Union representative at the contracting appointment; he thought "they were all

20    from the same thing, that [he] had to do this to become the IP provider."  *Id.*, at 30.  Neither the

21    State employee nor Peggy told Plaintiff Flores that Union membership was required.  *Id.*

22    Plaintiff Flores signed the Union membership card on July 5, 2016 and opted to donate an extra

23    $10.  *Id.*, at 31-32.  On July 28, 2016, like Plaintiff Alvarez, Plaintiff Flores also returned a call

24

1  to the Union and agreed to a similar "voice authorization card."  Dkt. 105-4, at 37-40.  Later,

2  after he realized that membership was not free, Plaintiff Flores contacted the Union to try to

3  cancel his membership, and wasn't successful at reaching the right people.  *Id.*, at 46-67.  He

4  didn't pursue it much because thought he had to wait a year to do so.  Dkt. 105-4, at 46-47.

5      While attending other basic training classes, Plaintiff Flores attended a Union presentation in

6  October 2016.  Dkt. 105-4, at 57-58.  Plaintiff Flores states that another class was scheduled, but

7  the Union representative showed up instead and gave "pretty much the same spiel she gave at the

8  contracting appointment."  Dkts. 105-4, at 59-60 and 100-3, at 5.  No one told Plaintiff Flores

9  that he had to stay for the Union presentation (Dkt. 105-4, at 60), but he thought it was training

10  time and so entered it in his timecard as such (Dkt. 105-4, at 74).

11      On October 27, 2016, Plaintiff Flores contacted the Union to cancel his $10 donation;

12  because, at that point, he understood that the $10 was in addition to the dues.  Dkt. 105-4, at 65-

13  66.  Plaintiff Flores states that he knows that in the future he will not be required to sit through or

14  attend any Union presentations.  Dkt. 105-4, at 70.

15  **F.  STATE SENDS PLAINTIFFS A DECEMBER 2016 LETTER REMINDING**
   **THEM THAT ATTENDANCE AT UNION PRESENTATIONS IS NOT**
16  **REQUIRED**

17      The State realized that the Plaintiffs still may be confused over whether attendance of Union

18  presentations was required in late 2016.  Dkt. 105-2, at 36.  On December 5, 2016, the State

19  wrote each of the Plaintiffs a letter, informing them that they "are not at any time, required to

20  meet with representatives from SEIU 775 as a condition of employment."  Dkt. 97, at 6, 8, and

21  10.  They were told that IPs "were not required to attend union presentations in connection with

22  any type of Individual Provider training, orientation or contracting meetings."  *Id.*  Plaintiffs

23  were informed that the Union "presentations were not mandatory" and that they will "suffer no

24

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT- 10

1   discrimination or retaliation as a result of [their] choice to meet, or not meet, with SEIU 775

2   representatives." *Id.*

3      Prior to sending the letter, the State had always imparted to its "field staff and managers []

4   that, as the State, [they] need to be neutral" in regard to issues related to the Union.  Dkt. 105-2,

5   at 37.  The State has been subject to "unfair labor practices charges in the past based on

6   allegations that its staff have attempted to influence workers in their choice to support or not

7   support the union or participate in union activities."  Dkt. 111, at 4.  So, the State counsels its

8   employees that if an IP asks, "Do I have to meet with a Union representative?" then the State

9   employee responds "no."  Dkt. 105-2, at 98.  Otherwise, the State employees "are not to be

10  caught up in union organizing activities or imply . . . [they] are for . . . kind of push the scale one

11  way or the other.  [They] just provide information as-is."  Dkt. 105-2, at 37.

12     The Training Partnership states that if asked, its representatives tell IPs that attendance at a

13  Union presentation is not required.  Dkt. 93, at 3.  Likewise, the Union also informs IPs that

14  attendance at a Union presentation is optional, if asked.  Dkt. 96, at 1.

15  **G.  STATE PUBLISHES UPDATED EMPLOYEE REFERENCE MANUAL IN
    FEBRUARY 2017**

16     In February of 2017, the State published an updated Employee Reference Manual which

17  provides, on the first page, in relevant part:

18  **SERVICE EMPLOYEES INTERNATIONAL UNION 775**

19     All individual provider long-term care workers are represented by Service
       Employees International Union (SEIU) 775. This is a result of a majority vote by
20     individual providers to form a union in 2002.

21     New individual providers are provided the opportunity to voluntarily meet with
       union representatives during the contracting process, and when they attend basic
22     training. Other individual providers have the opportunity to voluntarily meet with
       union representatives when they attend Continuing Education training. For details
23     refer to articles 2.3 and 15.13A and/or the April 04, 2016 signed Memorandum of
       Understanding of the Collective Bargaining agreement (CBA). A copy of the

24

1    CBA is posted on the Office of Financial Management web page located at:
     http://www.ofm.wa.gov/labor/agreements.

2

3    Dkt. 111, at 12.  It further advises IPs to "[c]all the Member Resource Center 1-866-371-3200 if

4    you have questions regarding the collective bargaining agreement, the union, union membership,

5    union benefits, or voluntary union activities." *Id.*  New IPs are given a copy of this manual when

6    they are given their orientation materials. Dkts. 105-2, at 83-84 and 111, at 3.

7                        **II.      DISCUSSION**

8    **A.  PLEADINGS FILED UNDER SEAL AND MOTIONS TO STRIKE**

9        In support of their motion for summary judgment, and in opposition to Defendants' motions

10   for summary judgment, Plaintiffs filed 589 pages of materials under seal.  Additionally, Plaintiffs

11   filed the full deposition of the witnesses' testimony, rather than filing just the portions cited in

12   their briefs.  (As for two of the deponents, Seth Hammond and Adam Glickman, (Dkts. 107-2)

13   Plaintiffs made no attempt at filing redacted versions of their depositions.)  Plaintiffs filed the

14   deposition of Grace Kiboneka in a redacted form at Dkt. 105-2 and in full form at Dkt. 107-1.

15   The portions of Ms. Kiboneka's deposition that were redacted concern the content of Union and

16   State negotiations, proposals, and thoughts on possible policies.  Dkts. 107-1.  Plaintiffs also

17   filed several documents including, internal Union scripts, internal Union talking points the Union

18   uses for recruiter training, and related Union training documents under seal.  Dkts. 107-3 to 107-
     6.

19

20       Plaintiffs' motion to seal (Dkt. 106) should be granted, without prejudice.  While some of the

21   pages of the pleadings filed under seal should remain under seal, the Court declines to go

22   through almost 600 pages of documents to determine which page should be unsealed, and which

23   should remain under seal.  Plaintiffs filing of entire depositions compounded the problem,

24

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT- 12

1  particularly where large sections of the depositions were not utilized in the motions, but may

2  contain material which arguably should be sealed.

3      Both the Union and the State move to strike section II C of Plaintiff's motion for summary

4  judgment, arguing that the content of the Union's speech is irrelevant to this case, particularly at

5  Union events that Plaintiffs did not attend.  Dkts. 109 and 110.  The Union and State also move

6  to strike those portions of the deposition transcripts that Plaintiffs filed in support of their

7  motion, "but did not cite to."  Dkt. 110.

8      The Union and the State's motion to strike section II C of Plaintiff's motion for summary

9  judgment and the deposition testimony submitted (Dkts. 109 and 110) should be denied.  While

10  some of it was of marginal or no relevance, the Court considered the entire motion and all the

11  submittals.

12  **B.  SUMMARY JUDGMENT STANDARD**

13      Summary judgment is proper only if the pleadings, the discovery and disclosure materials on

14  file, and any affidavits show that there is no genuine issue as to any material fact and that the

15  movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is

16  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

17  showing on an essential element of a claim in the case on which the nonmoving party has the

18  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

19  of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

20  for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

21  (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

22  metaphysical doubt.").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a

23  material fact exists if there is sufficient evidence supporting the claimed factual dispute,

24

1 | requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty*

2 | *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

3 | *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

4 |       The determination of the existence of a material fact is often a close question.  The court

5 | must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

6 | e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect.*

7 | *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

8 | of the nonmoving party only when the facts specifically attested by that party contradict facts

9 | specifically attested by the moving party.  The nonmoving party may not merely state that it will

10 | discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

11 | to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

12 | Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not

13 | be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

14 | **C.  STANDING**

15 |     The State and Union move to summarily dismiss Plaintiffs' case, asserting that they do not

16 | have standing under Article III of the U.S. Constitution.  Dkts. 91 and 95.

17 |     Pursuant to Article III of the United States Constitution, federal courts are limited to hearing

18 | only "cases" or "controversies."  "Standing is a core component of the Article III cases or

19 | controversies requirement." *Barnum Timber Co. v. U.S. E.P.A.,* 633 F.3d 894, 897 (9th Cir.

20 | 2011) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

21 |     The Plaintiffs do not seek damages.  Accordingly, in order have standing for the injunctive

22 | and declaratory relief they seek, Plaintiffs "must demonstrate a real and immediate threat of

23 | repeated injury in the future." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th

24 |

1    Cir. 2011)(*internal citations and quotations omitted*); *Gest v. Bradbury*, 443 F.3d 1177, 1182

2    (9th Cir. 2006).  In addition, they must make the traditional showing regarding standing - that

3    they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of

4    the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*

5    *v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016)(*citing Friends of the Earth,*

6    *Inc. v. Laidlaw Environmental Services, Inc*., 528 U.S. 167, 180–81 (2000)); *Gest*, at 1182.

7        Defendants' motions to summarily dismiss Plaintiffs' claims for injunctive and declaratory

8    relief (Dkts. 91 and 95) should be granted.  Plaintiffs have failed to show "a real and immediate

9    threat of repeated injury in the future." *Chapman,* at 946.  Past injury is insufficient to confer

10   standing to seek prospective injunctive or declaratory relief.  *City of Los Angeles v. Lyons,* 461

11   U.S. 95, 102 (1983)(injunctions); and *Leu v. Int'l Boundary Comm'n*, 605 F.3d 693, 694 (9th Cir.

12   2010) (declarations)(*citing Fieger v. Mich. Supreme Court*, 553 F.3d 955, 962 (6th Cir.2009)

13   ("In the context of a declaratory judgment action, allegations of past injury alone are not

14   sufficient to confer standing")).

15       Assuming, without finding, that Plaintiffs' constitutional rights had been violated when they

16   found themselves in a Union presentation because they were unaware that the presentation was

17   occurring and/or not mandatory, each has now received a letter from the State, dated December

18   5, 2016, that clearly states that attendance at Union presentations is optional and that they will

19   "suffer no discrimination or retaliation as a result of [their] choice to meet, or not meet, with

20   SEIU 775 representatives."  Dkt. 97, at 6, 8, and 10.  Each Plaintiff has testified that they are

21   aware that, in the future, they will not be required to sit through or attend any Union

22   presentations.  Dkts. 105-3, at 65-66; 105-5, at 52; and 105-4, at 70.

23

24

1    They make no showing that they have a reasonable expectation that a violation will occur in

2    the future.  Plaintiffs assert, that because of the way Union presentations are embedded in the

3    contracting appointments and training sessions, and the fact that IPs are not told Union

4    presentations are optional, Plaintiffs' harms are systematic and/or sanctioned by the State, and so

5    they have shown a "real and immediate threat of repeated injury in the future." *Chapman,* at

6    946.  Plaintiffs' assertions that the fact that IPs are not told that the Union presentations are

7    optional is without merit.  The CBA, as amended, specifically states that the Union presentations

8    are optional.  The CBA is available online, and Plaintiffs acknowledge that they could get a copy

9    of the current CBA if they choose.  Dkt. 105-5, at 21-22.  The Employee Reference Manual now

10   states that Union time is voluntary.  Dkt. 111, at 12.  They do not dispute that if asked, they are

11   told that they do not have to go to the presentations.  Nor do they dispute that each of them

12   knows that they do not have to attend.

13   While each filed a declaration indicating that they do not know how to put their ability to opt

14   out into practice (Dkts. 100-2, at 4; 100-3, at 6; and 100-4, at 5), simply walking out of the room,

15   or choosing not to play the Union presentation video if they are doing online training, would

16   suffice.  Plaintiff Shetler's personal concern, of feeling like a "black sheep" if she follows the

17   Training Partnership staff out of the room (and returns with training staff) or speaks up and

18   offers a different point of view at the Union presentation, is not sufficient to establish standing.

19   "Allegations of a subjective chill are not an adequate substitute for a claim of specific present

20   objective harm or a threat of specific future harm; the federal courts established pursuant to

21   Article III of the Constitution do not render advisory opinions." *Laird v. Tatum*, 408 U.S. 1, 13–

22   14 (1972)(*internal citations omitted*).

23

24

1    Moreover, Plaintiffs concerns that the State and Union may, in the future, agree to require

2 attendance at Union presentations, "is hypothetical and too speculative to confer standing." *Gest*,

3 at 1182. This is particularly true in light of the State's indication that it does not intend to

4 "propose or agree to a CBA provision in the future that would require IPs to participate in union

5 presentations." Dkt. 98, at 4.

6    D. **OTHER ISSUES**

7    Plaintiffs, at times, attempt to assert claims on behalf of all IPs. Those efforts are to no avail.

8 While Plaintiffs purport to bring the case on their own behalf and for "other similarly situated

9 IPs," (*e.g.,* Dkt. 85, at 11), this case has not been brought or certified as a class action.  In order

10 to have standing, Plaintiffs must establish that **they** will suffer a "repeated injury" and have not

11 done so.  *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 689

12 (9th Cir. 2010)("where a party seeks prospective relief, the question becomes whether the threat

13 to the plaintiff is sufficiently real and immediate to show an existing controversy").  Plaintiffs

14 make no showing that they have standing to assert claims on behalf of other IPs.

15    Plaintiffs' claim that the voluntary cessation exemption to mootness applies is equally

16 unavailing. "The voluntary cessation of challenged conduct does not ordinarily render a case

17 moot because a dismissal for mootness would permit a resumption of the challenged conduct as

18 soon as the case is dismissed." *Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014)(*internal

19 quotations and citations omitted*).  Application of the doctrine is doubtful.  Even if the

20 Defendants' actions could be considered a "voluntary cessation," the doctrine does not prevent

21 dismissal of the case.  In assessing whether voluntary cessation renders a case moot, courts in the

22 Ninth Circuit find that mootness is more likely if:

23    (1) [T]he policy change is evidenced by language that is broad in scope and
     unequivocal in tone, (2) the policy change fully addresses all of the objectionable

24

1   measures that the Government officials took against the plaintiffs in the case, (3) the case in question was the catalyst for the agency's adoption of the new policy,

2   (4) the policy has been in place for a long time when we consider mootness, and (5) since the policy's implementation the agency's officials have not engaged in

3   conduct similar to that challenged by the plaintiff.

4   *Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014)(*internal quotations and citations*

5   *omitted*).  The parties asserting mootness, the State and Union here, bear a "heavy burden of

6   proving that the challenged conduct cannot reasonably be expected to recur."  *Id.*

7   The State and Union have met their burden.  First, the State and Union's decision to enter

8   into the April 4, 2016 Memorandum of Understanding, as Plaintiffs acknowledge, did not change

9   the parties' policies.  The Defendants did not cease anything. On its face, it merely clarified that

10  participation in Union events is not mandatory, in a language that is "broad in scope and

11  unequivocal in tone."  It seems "more aptly described as reemphasizing, or recommitting to, an

12  existing policy."  *Rosebrock,* at 972.  While Plaintiffs assert the contrary, the Memorandum of

13  Understanding and amended CBA, in conjunction with the December 2016 letter sent to the

14  Plaintiffs, clearly addressed all of the objectionable measures Plaintiffs complained of.  This case

15  was not the catalyst for a change in policy; the Memorandum of Understanding and the letters to

16  Plaintiffs were an effort to communicate to Plaintiffs their rights, but those rights existed before

17  the case was filed.  The policy has been in place for several years; the Memorandum of

18  Understanding, which amended the CBA, was signed almost a year ago.  Moreover, since

19  entering into the Memorandum of Understanding and issuance of the letters to Plaintiffs, there is

20  no evidence that Plaintiffs have been constructively forced to attend or hear Union presentations.

21  The voluntary cessation doctrine, as a bar to mootness, does not apply.

22  Plaintiffs here have not demonstrated "a real and immediate threat of repeated injury in the

23  future."  *Chapman,* at 946.  The Court need not reach the remaining standing questions of

24

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT- 18

1   whether they have also shown they "(1) suffered an injury in fact, (2) that is fairly traceable to

2   the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable

3   judicial decision." *Spokeo,* at 1548.

4       Plaintiffs urge the Court to rule on whether they have, in fact, suffered a violation of their

5   First Amendment rights based how the State and the Union have structured Union access to the

6   bargaining unit, invoking the collateral consequences doctrine if the Court finds that they have

7   not shown "a real and immediate threat of repeated injury in the future."  Dkt. 112, (*citing Super*

8   *Tire Eng. Co. v. McCorkle,* 416 U.S. 115, 121-22 (1974)).  In that case, the Supreme Court held

9   that the plaintiffs had standing because they could again find themselves in the same situation in

10  the future.  The same reasoning does not apply here because Plaintiffs admit that they now know

11  that Union presentations are optional.

12      Plaintiffs acknowledge that they seek a ruling from the Court that their First Amendment

13  rights against "compelled listening" would require the Court to issue a ruling creating a right that

14  is not fully recognized in the law at present.  Plaintiffs' invitation to blend together various First

15  Amendment doctrines and create a new right under the Constitution should be declined,

16  especially here, where the Plaintiffs do not have standing for the relief they seek.  While the

17  undersigned does not condone some of the past Union practices, there is, at present, no live

18  controversy between the parties.  The Defendants' motions for summary judgment (Dkts. 91 and

19  95) should be granted, Plaintiffs' motion for summary judgment (Dkt. 100 refiled as corrected

20  104-1 and as unredacted at 107-7) denied, and the case dismissed.

21  /

22  /

23  /

24

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT- 19

1

### III.   ORDER

2      It is **ORDERED** that:

3      • Plaintiffs' Motion to Seal and/or Redact Documents (Dkt. 106) **IS GRANTED,**

4        **WITHOUT PREJUDICE;**

5      • The Union and State's motions to strike (Dkts. 109 and 110) **ARE DENIED;**

6      • Defendant Service Employers International Union Healthcare 775 NW's Motion

7        for Summary Judgment (Dkt. 91) **IS GRANTED**;

8      • The State Defendants' Motion for Summary Judgment (Dkt. 95) **IS GRANTED**;

9      • Plaintiffs' Motion for Summary Judgment (Dkt. 100 refiled as corrected 104-1

10       and as unredacted at 107-7) **IS DENIED**; and

11     • This case **IS DISMISSED** and all other pending motions and deadlines **ARE**

12       **STRICKEN**.

13     The Clerk is directed to send uncertified copies of this Order to all counsel of record and

14 to any party appearing *pro se* at said party's last known address.

15     Dated this 22nd day of March, 2017.

16

17     _____

18     ROBERT J. BRYAN
       United States District Judge

19

20

21

22

23

24